This is 418-0427. People v. Pruett. For the appellant is William Davis. You are he, sir? Yes, Your Honor. And for the appellee is Catherine Dorsch? Dorsch, correct. Is that pronounced correctly? Yes. A lucky guess. Okay. Mr. Davis, you may proceed. Thank you, Your Honor. May it please the Court. Counsel. Counsel. Your Honors, good afternoon. Your Honors, we raise three primary issues with regard to this matter and the trial that occurred about a year and a half ago, in November of 2017. As the Court is aware, the Section of the Violent Criminals Act requires the State to prove the honorees without multiple issues. And so this is the first of our arguments. And one of those issues the State must prove the honorees without is that the respondent to the act must be substantially probable to sexually reoffend. Substantially probable is much more likely than not. Not simply more likely, much more likely. In this case and in our arguments, we raise specifically the State presented two doctor experts, Dr. Marty W. Smith and Dr. Travis. Both of them specifically used two actuarial risk assessment tools, the static 99R and the static 2002R. These are tools that are used in many of these cases throughout the State and have appeared before this Court. Both Drs. Bellew-Smith and Travis scored Mr. Pruitt as a 3 on the 99R and as a 4 on the 2002R. Both acknowledge that this is a low to moderate range of risk. For the static 99R, it was described that Mr. Pruitt was 1.39 times more likely. The reason what these scores mean is that on the static 99R, Mr. Pruitt was 1.39 times more likely than the so-called average sex offender to reoffend. It was described that it was basically 1.5 times more likely, I believe, is the testimony of Dr. Bellew-Smith. For the static 2002R, 1.38 times more likely, so approximately the same. Dr. Bellew-Smith described it as, quote, slightly higher than the average score. And that phrase goes to the crux of what our issue is with this testimony on the issue of substantially probable to reoffend. But their opinions didn't end there. They weren't solely based on the two test scores, right? Correct, Your Honor. There are also dynamic risk factors that are taken into consideration and protective risk factors. Our contention, our issue with this and with this evidence in saying that it's not sufficient is that these are considered the baseline. They are considered the baseline. And the State has argued in its brief, and I assume she'll argue when she gets up here, that these are conservative. They underestimate. These tools do underestimate. That's what all the science suggests and supports. But what I would argue in court is they also underestimate and are conservative in the number of cases that we have presented within our brief where they are high risk. I believe it's the Hayes case described that respondent as being in the highest risk category. Yet even in that case, both State's experts, I believe, I know for sure Dr. Gaskell testified, well, he's still underestimating. He's in the highest potential risk score, but this still underestimates his risk. And so we still look at these dynamic risk factors and protective risk factors. Protective being less likely to affect me. And in this case, one of these protective risk factors that both, as the evidence showed, experts got a little bit wrong, was the job history. Both experts testified that Mr. Pruitt was not going to get a job, was not, basically was kind of a lax in society. Whereas the truth, what the evidence really shows, is that he had worked for over a dozen years at one location. And he was doing managerial duties. And they just sort of pushed that to the side. But the crux of our argument is that these low, moderate range of risks, what the State described in its brief as a baseline. These are the baselines. This is how these cases, I know this court has seen many of these cases. We've seen many of these SDP, even SDP cases. These are the baselines. This is the first thing that's presented in the testimony. That's how it was here. This is where it starts. And then they say, well, if they are in this risk category, is there anything that brings it up and down? And that's how they look at these dynamic risk factors. And in this case, many of these dynamic risk factors were basically more of the same. Similar things that were already scored within the 99R and the 2002R. And also things that highlighted more to our second issue, and ultimately why much of this is very important, is the use of prior acts, prior conduct as substantive evidence, which did occur in this case, but was argued for jury in this case. These dynamic risk factors that were used went directly to the uncharged conduct. They couldn't pull out a certified copy of a circuit court record and say, Mr. Pruitt pled guilty or was found guilty of X, because many of these prior conduct, these prior offenses, were either raised, and he was charged on one that was non-enforced. This was approximately 20 years ago. And some of these were never even raised to the police at the time, but came up years later. With the actual charged offense on the predicate offense, but also the case that was dismissed. So the state, in this trial, and most of the argument will get to that more in detail, tried to use those as substantive evidence, but it's not allowed to under Wilson v. Fluff. But ultimately, the dynamic risk factors used went to those specific offenses, prior conduct and prior issues. So, Your Honors, in this case, this baseline, I've been trying to think of a good way to analogize this, but if you have a ladder, you say the ladder is the risk scaling, and at some point on this ladder, when you go up or apply the stairs, you're going to be in the substantially probable to reach that. So when they describe these actuarial tests as the baseline, well, you might be two steps up the ladder, or two rungs up the ladder, or you might be five. That's what a baseline is. You start here. That's where you get all the way up, is the question. And in this, these are slightly higher than the average score, as Dr. Bell and Smith described. They are low to moderate. They are very low on this ladder. And even with these dynamic risk factors, there was massive evidence to prove, beyond a reasonable doubt, that Mr. Pruitt was substantially probable to defend. That's what we would ask the court to decide. The second issue, going to closing argument, is that the court reviews the approximately four to five pages of the state's closing arguments. It is littered, absolutely littered, with the state arguing substantively with the uncharged or dismissed prior condoms. And it's asked the jury multiple times to review those, not just as, hey, the experts reviewed this information. They reviewed it to make their diagnosis. They reviewed it for their risk assessment. They didn't just say that. The state didn't do what it was supposed to do in that regard. They said, I want you to consider this. Specifically, Your Honors, I would note the state's closing argument, the second sentence, the state argued, what the doctors all wanted you to really pay attention to was, it was a pervasive pattern of behavior that dates all the way back to the 80s. He's offending in the late 80s. He's offending again in the 90s, 2002, 2003. Well, but that's only partially improper if that. If he had said that the doctors note that he had offended again in the late 80s, the doctors note that he had done all this. That would be proper, wouldn't it? A hundred percent. So the fact that in frantics the prosecutor didn't say and point out that this was a basis for the doctors explaining their opinion, that's the problem that the same information could have been before the jury. It's just that it should have been prefaced or clarified in that regard. Shouldn't it? It should. Doesn't that affect how we review the extent to which this alleged error constituted reverse point? Context is key, Your Honor. Well, the point, I'm sorry, I'm not being clear. In other words, it's not so much that the jury heard something they didn't hear. It's that the jury didn't hear this evidence with the appropriate explanation about how it's not necessarily evidence that it happened, but it's evidence explaining why the experts came to the opinions they did. A bit of mental gymnastics here. Totally. We're not very limber. Well, but, you know, here's another problem. Especially when you're dealing with something that is not improper under all circumstances. I think we can say that. It's improper because the context needed to be added to it. The defense attorney isn't the potted plant here. Why doesn't the defense call this to the court's attention, object to it, or, for that matter, in advance of closing argument, say, you know, there's all this evidence out there, and I'd like the court to remind the prosecutor that it must be put in context if he's going to argue to the jury. That is a great question, Your Honor. Whether that happened. No, it didn't. There was, the instruction was given, the appropriate instruction was given to the jury at various times throughout the trial. That instruction was also included in the standard packet at the end of closing arguments before the jury went back to the room. Your Honor, we've raised this under the plain error doctrine, that I'm not in a dispute that trial counsel did not object contemporaneously. Well, here's the thing. I'm not sure, the plain error doctrine, limited doctrine, and all that, but I'm not even sure I've ever seen a plain error doctrine based on improper argument where what's at stake isn't the jury being told X, but the jury being told X without the appropriate contextual explanation, which is really what we're arguing here, right? It is. To a large extent, it is. But I would also argue the court, the state got a little more explicit in its statements, not just not providing the appropriate context. The state also argued, with regard to the six-month time period of the pedophilic disorder, the DSM diagnosis, 1989. There are victims that say it happened then. They didn't tell this jury. 1993, 1999, 2002, 2013, that's almost 25 years that these behaviors are occurring. Again, none of this was provided substantive evidence. Well, but this was all again stuff that the doctors referred to, wasn't it? It was. And I'll tell you, Your Honor, the most damning aspect and damning use of this was about two-thirds of the way, I believe, through his argument, almost towards the end, where the state states, quote, I put on those experts to help give you guys guidance. But you can use your own common sense, too. Like I said, you can determine what's the best predictor of future behavior, past behavior. 1989, 1993, 1999, 2000. But I'm not even sure that is necessarily neat, as you're saying. In other words, the doctors themselves used that past behavior as a predictor of future behavior. They had the prosecutor said, just like the doctor's report says, that's the best predictor, ladies and gentlemen. You can use your common sense to assess their testimony. There'd probably be nothing improper with that at all, would there?  For the weighing of credibility and the weight of the testimony, I can't really differ with the court on that. But it's the, I put them on there to give you guidance, but you can use your own common sense, too. And by saying that, he's not just saying you can look at what the doctor said. Well, it's in our fault and should have been clarified and could have been better said. But plain error? Is there any example where, an argument where it could have been better said and in our fault, but the same information having been provided in a better context would be okay? Has it ever been found to be plain error? I don't think so. Not that I could find, Your Honor, specifically to that extent. We'd be the first court to solve it. To my Westlaw research, possibly, Your Honor, yes. Who was the trial defense? I don't recall. In the record, do you recall who was the prosecutor in this case and who was the defense attorney? Prosecutor was Mr. Bryant. Is he from the AG's office? Yes, Your Honor. And then the defense were Betsy Beer and I'm from Quincy, but I don't know Mr. Alford, so I can't give you a first name on that. Ms. Beer does a lot of this litigation. She does. She does the bulk over in Adams County, Your Honor. A real expert in this area, so that's a two-edged sword. Why didn't she object? That's the, I might be too young for this reference, the $68,000 question. I don't know. I would argue, though, that that was part of the error. That was part of this issue. That this was information that was said to the jury, argued to the jury, presented to the jury, that should not have been. And, Your Honor, coupled it with, just prior to this statement of neutral and common sense, the state also argued, kids don't always report what happened. Moreover, sometimes when they do, the state's attorneys don't even prosecute the case because they're too hard to win. So that's why such a conservative number is a low number. Use your common sense. You see it all the time, too, in the news lately. You know, everyone is coming out of the woodwork saying they're offended. This is exactly what happened here. In November 2017, which I think was right in the middle of the hashtag MeToo movement, so all this stuff was in everybody's mind. All of this information was there. And he's using it to his advantage in a way that... The hashtag MeToo movement is affecting jurors in McLean County. That's a bit of a stretch, isn't it? This is not exactly a Hollywood glitter alley jury, is it? No, this is not Harvey Weinstein, Your Honor. But this is also, and I use that specifically, but the Catholic sex abuse scandal, I just saw an article, I think it was this morning or maybe last night, about the Boy Scouts. This is all stuff that is coming out of the woodwork. And he's not inaccurate in his statement on that. But to use that, to use that argument, coupled with exhorting the jury to review the specific substance of these prior acts and prior offenses, outside of the context of the experts' opinions, all of this coupled together is plain error. It was very serious. It denied Mr. Pruitt the right to a fair trial. All of this information was presented to the jury in a way that... As the first district court in Gavin overcomes these obstructions from the court, they are confusing obstructions, and the jury can, as instructed here, as instructed in Gavin, in closing arguments, can overcome those obstructions. Your Honors, my final argument is with regard to the granting of a new trial. I've already argued much of the basics of that, the factual basics of it, with regard to the risk assessment tools and whether or not that was sufficient evidence to prove Gavin's innocence. And we rear those basic arguments, with regard to the issue of whether or not it was against the manifest way of the evidence. The opposite conclusion is clearly evident in the finding of the jury with regard to the probability of an offense that was clearly unreasonable and arbitrary. Your Honors, my time is about to run out. I'll be back up after the state, and we'll welcome any questions.  Thank you. Okay, thank you, Mr. Davis. Ms. Dorsch? Good afternoon. May I please report? Counsel? I'm Assistant Attorney General Katherine Dorsch on behalf of the people. I'll be starting with the sufficiency argument. In an SBP case, and the Court's probably read, there are three elements. You have to prove that prior sexually violent offense conviction. You have to show that the respondent has a mental disorder that predisposes him or her to commit future acts of sexual violence. You've also got to show that that mental disorder makes it substantially probable to re-offend. Now, it's only that third element, the substantially probable element, that this respondent is challenging. So, the Jackson v. Virginia sufficiency standard applies in SBP cases, under which this Court has to look at the evidence and light most favorable to the state and determine whether the state's proof is sufficient to prove that element. And here it plainly was. The state presented two experts, Dr. Bellew-Smith and Dr. Travis, both of whom testified that the respondent is substantially probable to re-offend. Essentially, that's the end of the sufficiency argument. The act does not require... Nowhere does the act require that a respondent attain a certain score on an act to really be resolved. That's kind of an argument that, well, these actuarial scores were lower, and there were a lot of cases where the respondent submitted the actual actuarial test where the scores were higher. That really goes to weight and not sufficiency. But in any event, I want to explain that both experts testified that the actuarial instrument is basically one part of their risk assessment. So they used these actuarial results. Both of them used a static 99 in the 2002 art to give them sort of a baseline assessment of risk. And it's sort of a checklist of static factors, things that happened in the past, things that are unchangeable, you know, whether you've been married or lived with someone in an intimate relationship for two years, prior convictions, whether you met a stranger victim or any of the victims' males. It's sort of a checklist that statistically, like they compare it to insurance actuarial results, you get a risk category. It doesn't necessarily pertain to this particular respondent. It's just that people with these certain characteristics who scored this way are likely to have this level of risk. But both of them testified, both Dr. Kuglesmith and Dr. Travis, testified with these actuarial instruments on their estimate risk in every case because they only capture charged offenses. So any time someone commits an offense that's not reported or at all, it doesn't show up, right? It's not captured in these actuarial results. If something's reported and it's not charged for whatever reason, the victim is too young and the prosecutor thinks he can't get a conviction, perhaps those sort of things are not captured in these actuarials. How do you capture them? How do you capture those then? You have to do it, it's a matter of the doctor's professional assessment, right? As I said, those sort of things, that's one piece of the risk assessment. Then they have to look, the doctors look at the additional evidence. And here they said, well, the actuarial's really underestimating this particular respondent's risk, Mr. Curry's risk, because he's got basically a 25-year history of offending against young children. They don't show up, they just don't figure in, there's not basically, there's no spot for it to get a check in the box on this date, 99R or 2002R. So, just don't capture that kind of, that kind of stuff just isn't figured into the state. Here too, they said the actuarial's underestimating Mr. Pruitt's risk because he was still offending when he was 40s and 50s, when statistically one would expect someone at that age to take robbery, but we stopped offending. So that was another statistical anomaly. And the other reason Dr. Travis said that the actuarial's underestimating risk is because this respondent had been done in a sex offender treatment, which requires to be at the second, I believe it's the second stage, that the, that the committed person identify all their victims and discuss their offenses and pass a polygraph test. So essentially what Dr. Travis is saying by that is that we don't know whether we know about all the offenses that Mr. Pruitt committed. The respondent's not challenging or disputing that he committed these other uncharged offenses. In fact, he told one of these, I can think of at least two instances where he told the evaluator with respect to the four-year-old boy, said, I should have gone to prison for that. And another one where he said, one with the six-year-old girl who lives in the hotel, he said, well, that's not exactly how it happened. But he did admit that he thinks these uncharged conducts did take place. He's not disputing that it took place. So on the sufficiency of chargement, again, it's not a question of where they score on the actuarial. Instead, it's a matter of the expert's personal, professional judgment whether they're substantially probable to re-offend. And here the evidence is sufficient because both the state's experts testify that he was substantially probable to re-offend. In fact, in this case, there is no contrary expert opinion, which would matter for a sufficiency challenge, but it is important to know when we talk about the way to do it. And turning to the closing argument claim, the claim of course is forfeited because the defendant had two attorneys and neither of them objected to it. You heard Mr. Davis argue that the closing argument by the prosecutor in this case was improper because he essentially argued as substantive evidence matters which were admitted as a basis to explain the psychiatrist's opinion.